IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

RICHARD BURKHART,         )
                            )
        Plaintiff,      )
                            )
      v.                  )       CIVIL ACTION NO. 08-0643
                            )
MICHAEL J. ASTRUE,        )
COMMISSIONER OF SOCIAL   )
SECURITY,               )
                            )
        Defendant.    )

**<u>MEMORANDUM OPINION</u>**

CONTI, District Judge.

**I.      Introduction**

Plaintiff, Richard Burkhart ("Burkhart" or "plaintiff"), brings this action pursuant to 42

U.S.C. § 1383(c)(3), which incorporates 42 U.S.C. § 405(g), seeking review of the final

determination of the Commissioner of Social Security ("Commissioner" or "defendant") denying

plaintiff's application for disability insurance benefits ("DIB") under Title II of the Social

Security Act ("Act"), 42 U.S.C. §§ 401-33, and supplemental security income ("SSI") under Title

XVI of the Social Security Act, 42 U.S.C. §§ 1381-83(f).  The record was developed at the

administrative level, and the parties filed cross-motions for summary judgment.

**II.     Procedural History**

Plaintiff filed applications for DIB and SSI benefits on January 20, 2005, alleging

disability as of January 1, 1992, due to depression and drug and alcohol dependency issues.[1]  (R.

---

[1] Plaintiff filed three previous applications for social security benefits in 1998, 1999 and 2000.  In each
application he claimed a disability onset date of August 1, 1998.  (R. at 196-221, 223-84.)  Each of these claims was
denied at the administrative level.  *Id.*

at 59-63, 73, 148-51.)  Plaintiff's claims were initially denied, and he filed a timely request for an administrative hearing. (R. at 35-41, 152-56.)  A hearing was held on August 22, 2007, before an administrative law judge (the "ALJ").  (R. at 158-95.)  Plaintiff was represented by counsel and an impartial vocational expert (the "VE") also appeared and testified.  (*Id.*)  The ALJ issued an unfavorable decision on December 17, 2007, finding that plaintiff was "not disabled" within the meaning of the Act. (R. at 9-24.)  The ALJ's decision became the Commissioner's final decision when, on April 3, 2008, the Appeals Council denied plaintiff's request for review.  (R. at 4-7.)  Plaintiff's administrative remedies being exhausted, he now brings the instant action seeking review of the Commissioner's final decision, and the matter is before this Court on the cross-motions for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## III.    Plaintiff's Background and Medical History

### A.  <u>Background</u>

Burkhart was born on September 14, 1953. (R. at 148.)  He is currently fifty-six years old, making him fifty-one years old at the time of his application for benefits and fifty-three years old at the time of the administrative hearing.  (*Id*.)  He was thirty-eight on the alleged disability onset date.  (*Id*.)  Under the Commissioner's regulations, individuals who are fifty to fifty-four years old are considered persons "closely approaching advanced age" and their age is considered together with severe impairments and limited work experience in determining the applicant's ability to adjust to other work. 20 C.F.R. § 416.963.

Burkhart graduated from high school in 1971, not having attended any special education classes. (R. at 77.)  Aside from a variety of various and relatively short-lived odd jobs not considered to be substantial gainful activity, Burkhart's past relevant work experience consists of

being a self-employed sign painter from 1981 through 1988.  (R. at 74, 188-89.)  Sign painting is considered to be light work, but was performed by Burkhart at the medium physical exertional level. (R. at 189.)  Burkhart discontinued his sign painting operation on December 31, 1988 due to "lack of work."  (R. at 74.)  He further attributed the cessation of his sign painting activities to his inability to drive due to the suspension of his driving privileges.  (R. at 166-67, 180.)

Burkhart's daily activities include watching television and going for walks.  (R. at 84.)  He is able to take out the trash, cook a meal, vacuum, go grocery shopping, do housework and repairs, and laundry.  (R. at 83-84.)  Burkhart testified at the administrative hearing that he was working part time at a grocery store stocking shelves on the night shift. (R. at 167.)

### B.  Medical Records

### 1)  Dr. Jabbour's Records

The results of blood tests taken in August 2004 confirmed that Burkhart has hepatitis C. (R. at 95-103.)  Burkhart was seen by Nabil Jabbour, M.D. ("Dr. Jabbour") for physical examinations in May, November and December 2004. (R. at 95-96, 100.)  Dr. Jabbour diagnosed erectile dysfunction, hepatitis C, and chronic obstructive pulmonary disorder ("COPD"), and prescribed medication to treat Burkhart's symptoms.  (*Id*.)

Dr. Jabbour issued a report to the Pennsylvania Bureau of Disability Determination on March 11, 2006, indicating that he had been treating Burkhart "for a few years." (R. at 138.)  Dr. Jabbour stated that since March 2005, Burkhart was seen for "usual adulthood illness, hypertension, hepatitis C, COPD, and a history of hepatitis B."  (*Id*.)  Dr. Jabbour reported that during Burkhart's last visit on January 25, 2006, the primary concerns were his "hypertension,

3

erectile dysfunction, COPD, and hepatitis C," and medications were prescribed.  (*Id*.)  Dr.

Jabbour wrote Burkhart a prescription for Zoloft to treat his depression.  (*Id*.)

### 2) Unidentified Physician's Records

A Pennsylvania Department of Public Welfare Employability Assessment Form was

completed on January 13, 2005, for Burkhart by an unidentifiable physician. (R. at 104-05.)  The

assessment on the form, as denoted by a checked box, was that Burkhart is permanently disabled

due to hepatitis C and depression based upon a physical examination.  (*Id*.)

### 3) Dr. DiMalta's Records

A Clinical Psychological Disability Evaluation was performed by Vincent DiMalta, Ed.D.

("Dr. DiMalta") on April 13, 2005, at the request of the Pennsylvania Bureau of Disability

Determination. (R. at 113-20.)  The report from this evaluation, dated April 15, 2005, revealed

that Burkhart was cooperative in the examination, but exhibited signs of irritation and

tangentiality. (R. at 113.)

Burkhart's self-reported history of his illness revealed a long-standing pattern of drug and

alcohol issues, as well as periods of incarceration, including the most recent instance for which

he was still on parole. (R. at 113-14.)  Burkhart disclosed that he had been to different

rehabilitation facilities and participated in different methadone programs.[2]  (*Id*.)  Burkhart

displayed frustration with his current life situation and acknowledged that his life and personal

relationships were better before he started using drugs.  (*Id*.)

---

[2]Burkhart's history includes three inpatient detoxification rehabilitations in 1994, 1997, and 2000. (R. at 288-90, 301-02, 325-28.)

Burkhart reported that he had not been hospitalized for a mental disorder, but that he had been prescribed Zoloft[3] and trazodone.  (R. at 114.)  He disclosed his medical diagnosis of hepatitis C and suggested that may be the reason for his frequent tiredness. (*Id*.)

Dr. DiMalta noted that, when stressed, Burkhart's speech became pressured, but that it did not interfere with normal communication.  (*Id*.)  Burkhart expressed feeling sadness and stated that at times he sleeps too much and other times he does not sleep at all. (R. at 114-15.)  Burkhart admitted that he had difficulty concentrating and that he had thoughts of death, but had no plans of committing suicide. (R. at 115.)  Dr. DiMalta noted that even under minimal stress Burkhart's affect became broad and he exhibited signs of sadness.  (*Id*.)  Burkhart denied any hallucinations, illusions, or feelings of depersonalization or derealization.  (*Id*.)

Burkhart stated to Dr. DiMalta that he has difficulty relating to his limitations resulting from his past drug use and the legal consequences of his past drug use, but that he is able to control his feelings of irritation. (R. at 116.)

Dr. DiMalta diagnosed "major depression, reactive/agitated," and listed "rule out personality disorder not otherwise specified" at Axis II.  (*Id*.)  Dr. DiMalta assessed Burkhart's Global Assessment of Functioning ("GAF") at 48.[4]  (*Id*.)  Dr. DiMalta listed Burkhart's prognosis as guarded.  (R. at 117.)  Dr. DiMalta's impression was that Burkhart "is capable of

---

[3]Zoloft is an antidepressant drug used for the treatment of major depressive disorder. Side effects include nausea, dizziness, loss of appetite, diarrhea, upset stomach, and trouble sleeping.  Physicians' Desk Reference 2576, 2582 (62st ed. 2008).

[4]The GAF scale, designed by the American Psychiatric Association, ranges from zero to one hundred and assesses a person's psychological, social and occupational function.  A score between 41 and 50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job). *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-R) (4th ed. 2000).

5

performing daily activities, but whether or not he can do this on a sustained basis, is a function of his level of depression, which will need monitored closely." (*Id*.)

Dr. DiMalta completed a form assessing Burkhart's ability to handle the routine pressures associated with a common workplace setting and indicated by checking a box that Burkhart had slight restriction in his ability to understand, remember, and carry out short, simple instructions; moderate restriction in his ability to understand, remember, and carry out detailed instructions, make judgments on simple work-related decisions, and interact appropriately with the public; marked restriction in his ability to interact appropriately with co-workers and supervisors; and extreme restriction in his ability to respond appropriately to work pressures and changes in a usual work setting. (R. at 118.)  These findings were based upon a medical status exam which revealed depression, irritability, difficulty in concentrating, and tangential verbalizations. (*Id*.) Dr. DiMalta also noted that Burkhart's capability for social interaction was diminished by tangentiality in answering when feeling pressed. (R. at 119.)  Additionally, Dr. DiMalta found that Burkhart's past drug and alcohol abuse influenced his current situation, but that he was presently abstinent. (*Id*.)

**4) Dr. Tarter's Records**

A Psychiatric Review Technique form was completed by a state agency psychologist, Sharon Becker Tarter, Ph.D. ("Dr. Tarter") on May 12, 2005,[5] based upon her review of Burkhart's medical records. (R. at 121-37.)  Dr. Tarter concluded that Burkhart suffered from major depressive disorder resulting in mild restriction of activities of daily living; moderate

---

[5]The form has a typed date of "5/11/05" (R. at 121), but there is a handwritten notation that the date was "5/12/05." (*Id*.)

6

difficulties in maintaining social functioning and concentration, persistence or pace; and no episodes of decompensation. (R. at 124, 131.)  Dr. Tarter completed a Mental Residual Functional Capacity Assessment in which she found Burkhart to be not significantly limited in the majority of mental activities evaluated pertaining to understanding and memory; sustained concentration and persistence; social interaction, and adaptation. (R. at 134-35.)  Dr. Tarter found Burkhart to be moderately limited in the areas of carrying out detailed instructions; maintaining attention and concentration for extended periods; completing a "normal workday and workweek without interruptions from psychologically based symptoms" and performing "at a consistent pace without an unreasonable number and length of rest periods;" interacting appropriately with the general public; accepting instructions; and responding appropriately to criticism from supervisors; and responding appropriately to changes in the work setting. (*Id*.)

Dr. Tarter acknowledged in her narrative report that Burkhart's medically determinable impairments consist of major depression and history of drug abuse.  (R. at 136.)  Dr. Tarter noted no hospitalizations due to Burkhart's mental impairments, but that he was prescribed psychotropic medication.  (*Id*.)  Dr. Tarter indicated Burkhart's diagnosis of hepatitis C.  (*Id*.)

Dr. Tarter stated that Burkhart

> is capable of working within a work schedule and at a consistent pace. He can make simple decisions.  His impulse control is adequate.  His [activities of daily living] and social skills are functional.  He can sustain an ordinary routine and adapt to routine changes without special supervision. . . .  He retains the ability to perform repetitive work activities without constant supervision.  There are no restrictions in his abilities in regards to understanding and memory.

(*Id*.)

7

Dr. Tarter partially adopted the findings of Dr. DiMalta in her report, declining to credit his opinion of Burkhart's social adjustments because they are not supported by the medical record. (*Id.*) Dr. Tarter concluded that Burkhart's impairments do not prevent him from engaging in competitive work activity on a sustained basis. (*Id.*)

### 5) Dr. Kreinbrook's Records

Dennis W. Kreinbrook, Ph.D., ("Dr. Kreinbrook") performed a consultative examination of Burkhart on September 20, 2007, at the request of the Pennsylvania Bureau of Disability Determination. (R. at 139-47.) Burkhart related to Dr. Kreinbrook that he had experienced sad mood, diminished energy, lack of interest in pleasurable activities, and sleep disturbances since 1996. (R. at 140.) Additionally, he was diagnosed with depression and hepatitis B and C in 1996 by Monsour Hospital. (R. a 139.) Burkhart revealed that his medications included Zoloft for depression and trazodone for sleeping. (R. at 140.)

Dr. Kreinbrook observed that Burkhart had an overall depressed mood and a dull affective expression. (R. at 141.) Dr. Kreinbrook noticed, however, that Burkhart had appropriate emotional expressions during the examination. (*Id.*) Dr. Kreinbrook noted that Burkhart's overall intellectual ability, abstract thought ability, concentration ability, and social comprehension all were below average. (*Id.*) Dr. Kreinbrook found that Burkhart's history was negative for impulse control problems, and that he had "somewhat active social judgment and socialization." (*Id.*)

Dr. Kreinbrook's diagnoses were major depressive disorder, recurrent, moderate intensity, opiate dependency in remission since 2004, on Axis I, personality disorder, NOS, with

antisocial traits on Axis II, hepatitis B and hepatitis C on Axis III, and a GAF of 55[6] on Axis V. (R. at 141-42.)  Dr. Kreinbrook noted in his prognosis that Burkhart had a fair chance of substantial improvement if he were to continue ongoing treatment.  (R. at 142.)

Dr. Kreinbrook's personality assessment of Burkhart revealed that he experienced fairly significant emotional distress and was dissatisfied with his current situation regarding his health and vocational status.  (*Id*.)  He had high levels of anxiety and depression.  (*Id*.)  His past drug dependency was noted as well as likely suicidal ideation. (*Id*.)  Dr. Kreinbrook opined that Burkhart likely would be disagreeable to authority and resistant to rules, and that he was rebellious and self-centered.  (*Id*.)  Dr. Kreinbrook predicted that it was likely Burkhart would have conflict in interpersonal relationships. (*Id*.)

Dr. Kreinbrook tested Burkhart's cognitive ability and found that to be in the innate low average range. (R. at 142-43.)  Dr. Kreinbrook's psychiatric activities assessment of Burkhart disclosed that he has the capability of initiating social contact at times and getting along with others, communicating clearly, and interacting in public.  (R. 144.)  Dr. Kreinbrook reported Burkhart's social maturity was below average, his inability to interact with authority figures was problematic, that on numerous past occasions he has been terminated from employment, and that he has two felony convictions in his past.  (*Id*.)

Dr. Kreinbrook stated that, according to Burkhart, he is capable of understanding and carrying out instructions most of the time. (*Id*.)  He, however, cannot maintain a schedule or

---

[6]A score between 51 and 60 indicates some moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g. few friends, conflicts with peers or co-workers). *Diagnostic and Statistical Manual of Mental Disorders*, (DSM-IV-R) (4th ed. 2000).

routine and seldom finishes things that he begins. (*Id.*)  He has difficulty making decisions, although he tries.  (*Id.*)  His hepatitis C makes him too tired to perform at a consistent pace.  (R. at 145.)  Burkhart acknowledged that he is resistant to change, particularly when under stress, and that he is easily overwhelmed which caused him to perform in a poor manner.  (*Id.*)

Dr. Kreinbrook assessed Burkhart's mental functioning abilities and indicated no restriction in interacting appropriately with the public; a slight restriction in understanding, remembering and carrying out simple instructions, and responding appropriately to changes in a routine work setting; a moderate restriction in understanding, remembering and carrying out detailed instructions, interacting appropriately with supervisors and co-workers, and responding appropriately to work pressures in a usual work setting; and a marked restriction in making judgments on simple work-related decisions.  (R. at 146.)  The medical and clinical bases supporting these findings were listed as borderline IQ, depression, and lowered functional ability. (*Id.*)  Dr. Kreinbrook noted that Burkhart experiences low stamina as a result of his hepatitis C and that he has a history of opiate addiction that has been in remission since 2004.  (R. at 147.)

### 6) Dr. Bridges' Records

Tim Bridges, Ph.D. ("Dr. Bridges"), performed a consultative examination of Burkhart on April 6, 2000, for the Pennsylvania Bureau of Disability Determination.  (R. at 335-42.)  Dr. Bridges reported that Burkhart was undergoing methadone treatment in combination with group and individual counseling at PBS, Inc., The Second Step. (R. at 336.)  Dr. Bridges noted that Burkhart was prescribed psychiatric medication from Dr. Jabbour and had recently completed drug and alcohol detoxification treatment on an inpatient basis at St. Francis hospital.  (*Id.*)

Dr. Bridges' clinical assessment of Burkhart revealed that he maintained adequate ability in the areas of concentration, attention, and immediate and short-term memory. (R. at 338.) Burkhart's affect was perceived as appropriate although partially restricted. (*Id*.) Burkhart claimed to be capable of performing the activities of daily living, except during periods when he feels unmotivated. (*Id*.) Dr. Bridges noticed that Burkhart exhibited anxiety about his financial situation, and that he seemed reluctant to disclose fully the extent of his drug and alcohol use. (R. at 338-39.) Dr. Bridges rated Burkhart's intellectual functioning in the low average to average range, and stated that his judgment and insight were impaired by his drug and alcohol problems. ( R. at 339.) Dr. Bridges also observed that Burkhart's level of independent functioning would be diminished by vegetative symptoms of depression he displayed; a condition Dr. Bridges attributed to his drug and alcohol abuse. (*Id*.) After summarizing Burkhart's history, including his drug and alcohol problems and criminal record, Dr. Bridges concluded that "Burkhart presents as a reasonably intelligent man who could likely maintain gainful employment if he were able to successfully resolve his drug and alcohol issues." (*Id*.)

Dr. Bridges' diagnoses were polysubstance dependence, with physiological dependence, on agonist therapy, substance induced mood disorder, with depressive features, rule-out depressive disorder NOS, and generalized anxiety disorder at Axis I, psychological stressors - severe due to ongoing drug and alcohol abuse, occupational and economic problems at Axis IV, and a current GAF of 50, and the highest GAF in the past year of 50 at Axis V. (R. at 340.)

On an Agency check-box form, Dr. Bridges rated Burkhart's ability to maintain personal appearance and behave in an emotionally stable manner as fair and his ability to relate predictably in social situations and demonstrate reliability as poor or none. (R. at 341.) These

findings were based upon his history of substance use and dependency, the suspension of his driving privileges, history of poor work performance, specifically, "using deposits for job to purchase drugs," and his depressed personality.  (*Id*.)  Dr. Bridges stated:  "Employment in a consistent, simple routine setting with close supervision 'may' be successful if he maintains sobriety."  (*Id*.)

Dr. Bridges rated Burkhart's ability to follow work rules, relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, and maintain attention and concentration collectively as "fair," citing the suspension of his driver's license until 2029, methadone treatments, and depressed mood as support for these findings.  (R. at 342.)

Dr. Bridges rated Burkhart's ability to understand, remember, and carry out complex job instructions as poor or none, and his ability to understand remember and carry out detailed, but not complex job instructions and simple job instructions as fair.  (*Id*.)  Support for these findings is listed as "[t]hought content, recall, memory for remote [and] recent intact.  IQ estimated within average range.  Comprehension and orientation consistent with IQ.  Chronic [history] of heroine [sic] and other [substance abuse]."  (*Id*.)

### C.  VE Testimony

The VE considered the following hypothetical:

> I'd like you to assume this hypothetical of somebody with Mr. Burkhart's age, education, training, and work experience.  Assume no exertional impairments.  However, work needs to be simple, routine, low-stress meaning no deadlines or fast-paced production.  There should be no more than occasional interaction with the public, coworkers, or supervisors. Preferably the job be object-oriented.  Assuming these limitations, are there any jobs that can suggest of an unskilled nature?

(R. at 189.)  The VE responded that a hypothetical individual sharing those restrictions and limitations could perform work existing in the national economy at the light exertional level as a price marker of merchandise and inventory or an assembler of electrical equipment.  (Id.)  That same hypothetical individual could perform work existing in the national economy at the medium exertional level as an industrial cleaner or a warehouse worker. (R. at 190.)

### D. **ALJ's Findings**

After determining that Burkhart had met the insured status requirements of the Act through September 30, 1992, and had not engaged in substantial gainful activity since January 1, 1992, the alleged disability onset date, the ALJ found Burkhart's major depressive disorder and personality disorder NOS with antisocial traits to be severe impairments within the meaning of the applicable regulations, but did not meet or medically equal, either singly or in combination with other alleged impairments, any of the listings in 20 C.F.R. part 404, subpart P, appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, 416.926).  (R. at 14-16.) The ALJ determined that Burkhart maintained the residual functional capacity ("RFC")[7] to engage in work activity at all exertional levels, but limited to simple, routine, low stress work, limited in production and pace, object oriented, and limited to occasional interaction with people. (R. at 16.)  The ALJ concluded that, although Burkhart was unable to return to his past relevant work as a sign painter, a significant number of jobs existed in the national economy that Burkhart could perform, considering his age, education, work experience and RFC, and therefore he was

---

[7]Residual functional capacity is "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. § 416.945(a).

13

not disabled within the meaning of the Act at any time relevant to the rendering of the ALJ's decision.  (R. at  22-23.)

**IV.**   **Standard of Review**

This court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence. 42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or reweigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986).  Congress has expressed its intention that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C. § 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  As long as the Commissioner's decision is supported by substantial evidence, it cannot be set aside even if this court "would have decided the factual inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).

**V.**   **Discussion**

In order to establish a disability under the Act, a claimant must demonstrate a "medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period." *Stunkard v. Sec'y of Health and Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987)); 42

14

U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful

activity "only if his physical or mental impairment or impairments are of such severity that he is

not only unable to do his previous work but cannot, considering age, education, and work

experience, engage in any other kind of substantial gainful work which exists in the national

economy. . . ." 42 U.S.C. § 423(d)(2)(A).  To support his ultimate findings, an administrative law

judge must do more than state factual conclusions.  He must make specific findings of fact.

*Stewart v. Sec'y of Health, Educ. and Welfare*, 714 F.2d 287, 290 (3d Cir. 1983).  The

administrative law judge must consider all medical evidence contained in the record and must

provide adequate explanations for disregarding or rejecting evidence. *Weir ex. rel. Weir v.*

*Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

   The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority

under 42 U.S.C. § 405(a), has developed a five-step sequential evaluation process for the purpose

of determining whether a claimant is "disabled" within the meaning of the Act.  The United

States Supreme Court summarized this process as follows:

> If at any step a finding of disability or non-disability can be made, the SSA
> will not review the claim further.  At the first step, the agency will find
> nondisability unless the claimant shows that he is not working at a
> "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b).  At
> step two, the SSA will find nondisability unless the claimant shows that he
> has a "severe impairment," defined as "any impairment or combination of
> impairments which significantly limits [the claimant's] physical or mental
> ability to do basic work activities." §§ 404.1520(c), 416.920(c).  At step
> three, the agency determines whether the impairment which enabled the
> claimant to survive step two is on the list of impairments presumed severe
> enough to render one disabled; if so, the claimant qualifies. §§
> 404.1520(d), 416.920(d).  If the claimant's impairment is not on the list,
> the inquiry proceeds to step four, at which the SSA assesses whether the
> claimant can do his previous work; unless he shows that he cannot, he is
> determined not to be disabled.  If the claimant survives the fourth stage,

15

the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

Burkhart raises four arguments: 1) the ALJ erred in applying the applicable law relating to alcoholism and drug addiction; 2) the ALJ failed to explain adequately why certain evidence was rejected; 3) the ALJ failed to explain adequately the basis for the RFC determinations; and 4) the ALJ erred by not including plaintiff's mental functioning limitations in the hypothetical posed to the VE.  Each argument will be addressed.

**A.  Whether the ALJ erred in applying the framework for considering substance abuse**

Burkhart's first argument against the validity of the ALJ's decision is that the ALJ failed to apply correctly the law relating to alcoholism and drug addiction in determining that Burkhart was not disabled.  Burkhart's position is that the ALJ did not conduct the proper analysis under the Regulations and Program Operations Manual System ("POMS"),[8] which requires that after deciding whether an individual is disabled considering all impairments including the addiction, the administrative law judge must then decide whether the addiction is a contributing factor material to the finding that the claimant is disabled. POMS § DI 90070.050 (available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0490070050!opendocument last visited 8/12/09). Burkhart's argument is misplaced.  POMS § DI 90070.050(B)(1) explains the process for making

_____

[8] The POMS is "'the publicly available operating instructions for processing Social Security claims,'" and although "'these administrative interpretations are not products of formal rulemaking, they nevertheless warrant respect.'" *Artz v. Barnhart*, 330 F.3d 170, 176 (3d Cir. 2003) (quoting *Wash. Dept. of Social Servs. v. Keffeler*, 537 U.S. 371, 385 (2003)).

16

a "material" determination on a drug or alcohol addiction inquiry and directs:  "If the individual is not disabled, STOP.  (No material determination needed.)" That process is what happened here.  The ALJ found that Burkhart was not disabled.  Therefore, under POMS, it was unnecessary to conduct an analysis concerning whether or not his drug and alcohol addictions, in remission, were material to the determination of disability, because such a determination had not been made.  A finding that a claimant is disabled is necessary, in the first instance, to trigger the analysis.

Section 105 of the Contract With America Advancement Act of 1996 provides that "[a]n individual shall not be considered to be disabled . . . if alcoholism or drug addiction would . . . be a contributing factor material to the Commissioner's determination that the individual is disabled." 42 U.S.C. §§ 423(d)(2)(C), 1382c(a)(3)(J); Pub. L. No. 104-121, § 105; 110 Stat. 847, 853-54 (1996).  The Commissioner has established a framework for making determinations about the materiality factor of alcoholism or drug addiction when deciding whether or not an individual is disabled. 20 C.F.R. §§ 404.1535, 416.935.  Under this framework, the "key factor . . . in determining whether drug addiction or alcoholism is a contributing factor material to the determination of disability" is whether or not a claimant would still be found disabled absent the alcohol or drug use. 20 C.F.R. §§ 404.1535(b)(1), 416.935(b)(1).

The general provisions of this administrative framework presuppose a finding of disability before engaging in the material factor determination. 20 C.F.R. §§ 404.1535(a), 416.935(a) ("*If* we find that you are disabled and have medical evidence of your drug addiction or alcoholism, we must determine whether your drug addiction or alcoholism is a contributing factor material to the determination of disability.") (emphasis added).  Some courts have even

held that drug addiction or alcoholism may not even be considered until a finding has been made that a claimant is disabled. *See Brueggemann v. Barnhart*, 348 F.3d 689, 694 (8th Cir. 2003) ("Substance use disorders are simply not among the evidentiary factors our precedents and the regulations identify as probative when an ALJ evaluates a physician's expert opinion in the initial determination of the claimant's disability."). Under this framework, the court concludes that the ALJ did not err in applying the law relating to substance abuse in making his disability determination.

Burkhart argues that the ALJ's finding that his history of opiate dependency had no more than a *de minimis* effect on his ability to work "may well have been true when the decision was issued but . . . [i]t is ludicrous to suggest that substance abuse was not significantly interfering with Mr. Burkhart's functioning in 1994, 1997, and 2000 when he received inpatient detoxification." (Pl.'s Br. 4.) Even were the court to assume for sake of argument that Burkhart was disabled in 1994, 1997, and 2000, in order for Burkhart to be awarded DIB he had to be found to be disabled in 1992 and to be awarded SSI he had to be found to be disabled at some point from the date of his protective filing, January 20, 2005, until the date of the ALJ's decision, December 17, 2007. As such, a finding that Burkhart was disabled in 1994, 1997, and 2000 is not relevant for purposes the decision of the ALJ.

For these reasons, the court finds that the ALJ committed no error in his treatment of Burkhart's drug addiction in making his disability determination.

**B. <u>Whether the ALJ erred in failing to explain why certain evidence was rejected</u>**

Burkhart's argues that the ALJ improperly rejected evidence favorable to his claim without adequate explanation. Burkhart alleges that the ALJ discounted medical opinion

18

evidence and his testimony without providing good reasons.  Burkhart states that rather than weighing the medical opinion evidence in the record, as dictated by the applicable regulations, the ALJ improperly considered the evidence in isolation. *See, e.g.,* 20 C.F.R. §§ 404.1527, 416.527 ("If any of the evidence in your case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, we will weigh all of the evidence and see whether we can decide whether you are disabled based on the evidence we have." 20 C.F.R. § 404.1527(c)(2)).  Burkhart targets the ALJ's analysis of the reports by Dr. Bridges, the unidentifiable physician who submitted a report to the Pennsylvania Department of Public Welfare in January 2005, Dr. DiMalta, and Dr. Kreinbrook as being insufficient and warranting remand.  Burkhart avers that the ALJ's credibility assessment regarding his testimony was insufficient because it was conveyed in "conclusory, non-case-specific boilerplate" language. (Pl.'s Br. 13.)

When the record contains conflicting evidence, an administrative law judge "may choose whom to credit but cannot reject evidence for no reason or for the wrong reason." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (internal citations omitted).  "[A]n explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.

**1) Dr. Bridges' Report**

Burkhart's characterization of the ALJ's analysis of Dr. Bridges' report is not persuasive. Burkhart asserts that the ALJ erred in giving little weight to the opinion of Dr. Bridges because the ALJ found that "he based his opinion on the then rampant substance abuse which currently, is controlled and nonsevere."  (R. at 21.)  Burkhart contends that this was improper because the

19

ALJ's analysis did not apply the correct standard regarding substance abuse and alcoholism as detailed in his first argument.  The court found no error in the ALJ's treatment of Burkhart's substance abuse and that same argument made under a different heading must necessarily fail.

Burkhart avers that the ALJ's analysis of Dr. Bridges' opinion was inaccurate.  The crux of this argument is largely semantic.  First, Burkhart points to Dr. Bridges' statements in his report that plaintiff "could *likely* maintain gainful employment if he were able to successfully resolve his drug and alcohol issues" (R. at 339) (emphasis added)  and that "[e]mployment in a consistent, simple, routine setting with close supervision 'may' be successful if he maintains sobriety." (R. at 341) (internal quotation marks in original).  Burkhart argues that "Dr. Bridges was far from certain whether sobriety would restore Mr. Burkhart's ability to work."  (Pl.'s Br. 7.)  Burkhart cites no authority, and the court can find none, that holds a medical source must find that a claimant can return to work with certainty in order to justify a finding that the claimant is not disabled.  Dr. Bridges' statements quoted above and in plaintiff's brief, despite lacking certitude, do not manifest a finding that Burkhart was disabled.  The ALJ assigned Dr. Bridges' opinion little weight, which, as discussed above, the court did not find to be an error.

Burkhart argues that the third Axis I diagnosis by Dr. Bridges of "Rule-Out Depressive Disorder NOS" (R. at 340) "indicat[es] that he was not certain whether there was a depressive disorder independent of substance abuse" (Pl.'s Br. 7) and that the fourth Axis I diagnosis by Dr. Bridges of "Generalized Anxiety Disorder" (R. at 340) "constituted a definite diagnosis of an independent mental disorder" (Pl.'s Br. 7) because it "was not qualified with 'rule-out.'" (*Id.)*

Dr. Bridges' third and fourth Axis I diagnoses, however, were not independent of Burkhart's substance abuse; in Dr. Bridges' accompanying narrative discussion he stated

20

Burkhart "presents with vegetative symptoms of depression likely secondary to his chronic drug dependency and ongoing use" (R. at 339) and "[h]e generally presented as emotionally compromised secondary to ongoing substance abuse and dependence." (*Id.*)  The ALJ found that Burkhart's major depressive disorder , as diagnosed by Dr. Bridges, is a severe impairment. Despite Burkhart's urging, the ALJ was not required to find that Burkhart was disabled based upon these diagnoses.  The ALJ did account for them in rendering his decision.  The court finds that substantial evidence supports the ALJ's analysis of Dr. Bridges' report.

### 2) Unidentified Physician Report

Burkhart takes issue with the ALJ's rejection of a January 2005 report submitted to the Pennsylvania Department of Public Welfare in which an unidentifiable physician stated that Burkhart was permanently disabled due to hepatitis C and depression.  The ALJ dismissed the opinion on the grounds that it lacked clinical or objective findings, was contrary to Burkhart's activities of daily living, contained no supporting analysis, was prepared for the purpose of obtaining state welfare benefits, and was in the form of an unsupported conclusion.  Burkhart alleges that the ALJ did not properly consider the opinion along with the other evidence of record, but in considering it in isolation failed to weigh properly the opinion.  He asserts that the only factor of the ALJ's rejection of the opinion that needs to be considered is the finding that the opinion is inconsistent with Burkhart's activities of daily living which "reflect an ability to engage in sedentary, light, medium, and heavy work activity on a sustained basis." (R. at 15.) Burkhart argues that Burkhart's activities of daily living do not support the ALJ's conclusion that he could engage in those work activities.

21

An administrative law judge may reject the opinion of a physician if it is contrary to other medical evidence contained in the record, *see, e.g., Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988), if it is insufficiently supported by clinical data, *see, e.g., Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985), or if it is in the form of an unsupported conclusory opinion, *see, e.g., Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991). The Pennsylvania Department of Public Welfare's standard of disability does not mirror that of the Act, and a finding of permanent disability under the former does not mandate the same finding under the latter. *See* 20 C.F.R. § 404.1504 ("A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind is based on its rules and is not our decision about whether you are disabled or blind. We must make a disability or blindness determination based on social security law. Therefore, a determination made by another agency that you are disabled or blind is not binding on us."). An opinion that a claimant is "disabled" or "unable to work" is not dispositive or entitled to special deference. *See Adorno*, 40 F.3d at 47-48; 20 C.F.R. §§ 404.1527(e), 416.927(e). Disability determinations are the province of the administrative law judge. 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Here, the ALJ's rejection of this opinion was based upon several factors, including that it was not supported by clinical data. That factor is supported by the record. The court must conclude that the ALJ's determination to give little weight to that report is supported by the record.

### 3) Dr. DiMalta's Report

Burkhart challenges the ALJ's analysis of the opinion of Dr. DiMalta, a clinical psychologist. Dr. DiMalta performed a consultative examination of Burkhart on April 13, 2005. Burkhart's position is that the ALJ "cherry-picked" the opinion of Dr. DiMalta, affording great

weight to his assessment as a whole, but rejecting the most extreme limitations Dr. DiMalta found regarding social functioning, work pressures in a usual work setting, and changes in a routine work setting.  The ALJ rejected these extreme restrictions because he found that they were inconsistent with Dr. DiMalta's own findings, clinical findings of record, other substantial evidence, and did not result in one or more episodes of decompensation or any periods of hospitalization.  Burkhart claims the ALJ committed error in not thoroughly analyzing Dr. DiMalta's assessment of these limitations, but instead discounted them based upon his foregoing analysis in the decision.  Burkhart complains that the ALJ does not explain where in the preceding analysis his reasons for rejecting the opinion are found, and claims that "Plaintiff's counsel is unable to locate it."  (Pl.'s Br. 11.)

The reasons, however, were set forth in the ALJ's decision.  The ALJ noted that Dr. DiMalta's own report stated that Burkhart is capable of engaging in normal communication despite demonstrating pressured speech when stressed, which undercuts Dr. DiMalta's finding of marked limitation in interacting appropriately with supervisors and co-workers.  The ALJ noted that Dr. Kreinbrook assessed Burkhart as having moderate limitations in responding appropriately to work pressures in a usual work setting and slight limitations in responding appropriately to changes in a routine work setting, which contradicts Dr. DiMalta's assessment of extreme limitations in those areas.  The ALJ noted that Burkhart has experienced no episodes of decompensation, which conflicts with Dr. DiMalta's finding of extreme limitations.  Dr. Tarter's assessment of Dr. DiMalta's findings is congruous with that of the ALJ.  The court concludes that substantial evidence supports the ALJ's analysis of Dr. DiMalta's report.

**4) Dr. Kreinbrook's Opinions**

Burkhart takes issue with the ALJ's treatment of Dr. Kreinbrook's report from his consultative examination performed on September 20, 2007, again accusing the ALJ of "cherry-picking" the opinion.  Burkhart challenges the ALJ's dismissal of Dr. Kreinbrook's finding that Burkhart has marked limitation in his ability to make judgments on simple work-related decisions based upon its inconsistency with Dr. Kreinbrook's own findings, other clinical findings of record, and other substantial evidence as "analyzed above."  Burkhart characterizes this reference as "cryptic" and "conclusory."

Burkhart is mistaken.  The ALJ pointed out that Dr. Kreinbrook reported that Burkhart attempted to make decisions "most of the time," although not without some difficulty, which is inconsistent with a finding of marked limitation in the area of making judgments on simple work-related decisions.  The ALJ noted that Dr. DiMalta found that Burkhart was only moderately limited in making judgments on simple work-related decisions.  There is substantial evidence to support the weight afforded by Dr. Kreinbrook's report.

**5) Plaintiff's credibility**

Burkhart attacks the sufficiency of the ALJ's decision with respect to his credibility assessment.  Burkhart claims that the ALJ addressed Burkhart's credibility in "conclusory, non-case-specific boilerplate" which he attempts to support with "other boilerplate earlier in the decision."  (Pl.'s Br. 13.)

In making the determination with respect to plaintiff's credibility, the ALJ noted Burkhart's activities of daily living included working part-time stocking shelves, taking out the trash, preparing meals, using a vacuum cleaner, doing housework, doing repairs, going for walks,

24

sometimes for several miles, lifting thirty-five to forty pounds, tending to his personal needs,

washing laundry, shopping, and paying his bills (R. at 18), Burkhart's ability to respond to

questions appropriately at the administrative hearing (R. at 19), the absence in the record of

episodes of decompensation (*Id.*), Dr. Kreinbrook's report that Burkhart had no history of

impulse control problems and that he tried to make decisions most of the time (R. at 20), that

Burkhart's substance abuse has been in remission since 2004 (*Id.*), that his history of substance

abuse does not appear to compromise his ability to perform basic, work-related activities (R. at

21), that Burkhart had normal range of motion, clear lungs, and regular heart rate and rhythm

(*Id.*), that he had good range of motion of his extremities, normal peripheral pulses, normal

reflexes, no motor deficit, no neurological deficit, and normal sensation (R. at 22), and he

experienced no significant side effects from his medication. (*Id.*).  The ALJ followed the

strictures of 20 C.F.R. §§ 404.1529(c) and 416.929(c) and SSR 96-7p concerning the factors to

consider in assessing the credibility of a claimant's statements, which include activities of daily

living, location, duration, frequency and intensity of pain or other symptoms, factors that

precipitate and aggravate the symptoms, type, dosage, effectiveness and side effects of

medication, other treatment the claimant receives, measures other than treatment the claimant

uses to alleviate pain or other symptoms, and any other factors relevant to the inquiry.

An administrative law judge has authority to make credibility determinations.  *Van Horn*

*v. Schweiker,* 717 F.2d 871, 873 (3d Cir. 1983).  "Because he had the opportunity to observe the

demeanor and to determine the credibility of the claimant, the ALJ's observations concerning

these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989-90. (4th Cir.

1 984).  An administrative law judge's credibility determination needs to be supported by

substantial evidence on the record.  Here, the ALJ considered Burkhart's subjective complaints and assessed them in the context of the entirety of the medical evidence.  He determined that plaintiff's statements concerning the effects of the symptoms were not entirely credible.  Substantial evidence supports the ALJ's credibility determination.  While it is true that the court need not consider  "the ALJ's bare recital of the boilerplate language that he 'carefully considered all the testimony . . . and the exhibits' to be sufficient," *Cotter*, 642 F.2d at 707 n.10, the court does not find that to be the case here.

**C.**  **Whether the ALJ failed to explain adequately the RFC determination**

Burkhart argues that the ALJ did not adequately explain his findings relating to Burkhart's RFC.  An administrative law judge may use his discretion, in consultation with medical opinion, to determine a claimant's RFC.  20 C.F.R. §§ 404.1527(e), 416.927(e); Social Security Ruling 96-5p.  An administrative law judge need only include those limitations which he or she finds to be credible in the RFC determination.  *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *see also Hartranft*, 181 F.3d at 362.  The ALJ in assessing Burkhart's RFC found:

> **5.  After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform work-related activities at all exertional levels (including "sedentary," "light," "medium," and "heavy").  Additionally, the claimant is limited to simple, routine, low stress work involving no deadlines or a fast-paced production environment.  He requires object oriented work.  He is limited to occasional interaction with supervisors, coworkers, and the general public.**

(R. at 16.)

26

The crux of Burkhart's argument on this point is repetitive of his assessment of the ALJ's analysis of the medical evidence under his previous arguments. Burkhart asserts that the ALJ did not properly explain his findings. Burkhart avers that the ALJ did not properly assess the reports of Dr. DiMalta and Dr. Kreinbrook. The court already addressed the sufficiency of the ALJ's treatment of these opinions and found no error.

Burkhart alleges that the ALJ failed to include all the limitations found by Dr. Tarter in his RFC assessment. Burkhart suggests that the ALJ did not adequately account for the moderate limitations found by Dr. Tarter in the areas of ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to sustain a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, ability to interact appropriately with the general public, ability to accept instructions and respond appropriately to criticism from supervisors, and ability to respond appropriately to changes in the work setting in his RFC. This argument is flawed. Burkhart wants to advance the position that the ALJ was required to include the moderate limitations found in the Summary Conclusions contained in Part I of the RFC Assessment Form[9] in assessing Burkhart's RFC. Section I, however, is not the actual RFC assessment, but "**merely a worksheet** to aid in deciding the presence and degree of functional limitations and the adequacy of the documentation and **does not constitute the RFC assessment.**" POMS §§ DI 24510.060, .061, .063, .064 and .065 (emphasis in original).[10] The

---

[9] Form SSA-4734-F-SUP.

[10] Available at https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510060!opendocument;
https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510061!opendocument;
https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510063!opendocument;
https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510064!opendocument;

actual RFC assessment is contained in Section III of the Form.  Agency professionals are advised

that:

> NOTE: The purpose of section I ("Summary Conclusions") on the SSA-4734-F-SUP is chiefly to have a worksheet to ensure that the psychiatrist or psychologist has considered each of these pertinent mental activities and the claimant's or beneficiary's degree of limitation for sustaining these activities over a normal workday and workweek on an ongoing, appropriate, and independent basis.  **It is the narrative** written by the psychiatrist or psychologist **in section III** ("Functional Capacity Assessment") of form SSA-4734-F4-SUP **that adjudicators are to use as the assessment of RFC.**  Adjudicators must take the RFC assessment **in section III** and decide what significance the elements discussed in this RFC assessment have in terms of the person's ability to meet the mental demands of past work or other work.  This must be done carefully using the adjudicator's informed professional judgment.

POMS § DI 25020.010 (emphasis in original) (available at

https://secure.ssa.gov/apps10/poms.nsf/lnx/0425020010!opendocument last visited 8/12/09).

Dr. Tarter's RFC assessment contained in section III of the Form found that Burkhart is

capable of working at a consistent pace within a work schedule, that he can make simple

decisions, that he exhibits adequate impulse control, and that he has functional social skills and

activities of daily living.  Dr. Tarter reported that plaintiff is capable of sustaining an ordinary

routine and adapting to routine changes without special supervision.  Dr. Tarter found that

Burkhart had the ability to perform repetitive work activities without constant supervision and

that he is unrestricted in his abilities relating to understanding and memory.  Dr. Tarter concluded

that Burkhart's limitations resulting from his impairments do not prevent him from meeting the

basic mental demands of engaging in competitive work activity on a sustained basis.

---

https://secure.ssa.gov/apps10/poms.nsf/lnx/0424510065!opendocument last visited 8/12/09.

The ALJ explained how the findings of Dr. DiMalta, Dr. Kreinbrook, and Dr. Tarter supported his RFC determination.  Where certain findings in those reports were not supported, he explained why those findings were rejected.  Burkhart bears the burden of showing that he lacks the RFC ascribed by the ALJ. *See Plummer*, 186 F.3d at 428.  Despite Burkhart's insistence that the RFC ascribed by the ALJ is insufficient, he points to no specific medical evidence in the record to support his position, instead relying on pointing out the perceived inadequacies of the support the ALJ found in the record for the determination he made.  The ALJ's RFC assessment of Burkhart was adequately supported by substantial evidence.

### D.  Whether the hypothetical posed to the VE failed to include plaintiff's credible mental functioning limitations

Burkhart's final assignment of error to the ALJ's decision is that the hypothetical posed by the ALJ to the VE was deficient because he failed to include required findings regarding Burkhart's mental functioning.  Burkhart urges that the ALJ was required to include his limitations in activities of daily living, social functioning and ability to maintain concentration, persistence, or pace in framing his hypothetical questions to the VE at the administrative hearing. The ALJ's hypothetical question posed to the VE asked that she assume an individual with "no exertional impairments.  However, work needs to be simple, routine, low-stress meaning no deadlines or fast-paced production.  There should be no more than occasional interaction with the public, coworkers, or supervisors.  Preferably the job be object-oriented."  (R. at 189.)  Given those limitations, the VE was able to identify jobs existing in significant numbers in the national economy that such an individual could perform.

Hypothetical questions to a vocational expert must accurately reflect all of a claimant's credibly established limitations. *See Rutherford v. Barnhart*, 399 F.3d 546, 554 (3d Cir. 2005). An administrative law judge may exclude limitations that are "reasonably discounted" by the evidence. *Rutherford*, 399 F.3d at 555.  The ALJ accounted for Burkhart's limitations in activities of daily living, social functioning and ability to maintain concentration, persistence or pace by limiting the hypothetical individual in his question to the VE to simple, low-stress work with no deadlines, limited interaction with the public, coworkers, or supervisors, and further limiting the job to be preferably object-oriented.  There is substantial evidence of record to support the conclusion that these limitations adequately encompass all Burkhart's credibly established limitations.

Because the ALJ's hypothetical questions to the VE properly encompassed all the impairments supported by the objective medical evidence in the record, it was not unreasonable. Under those circumstances, the ALJ's reliance on the VE's testimony is not unreasonable.

**VI.**     **Conclusion**

For the reasons discussed above, the decision of the ALJ is affirmed, and the Commissioner's motion will be granted.  Plaintiff's motion will be denied.  An appropriate order shall issue.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: September 16, 2009

30